May it please the court, Michael Desmond, representing the petitioner appellant in this matter, Michael Tricarichi. With the panel's consent, I'd like to reserve two minutes of my time for rebuttal. Your honors, we're here 15 years after the tax year at issue in this case, the 2003 tax year. Through a series of administrative audits, administrative appeal proceedings, and litigation in the tax court, the issue presented here is whether the IRS should be allowed and permitted to collect from Michael Tricarichi as an individual more than four times the corporate income tax liability that went unpaid from Westside Cellular. You know, that's an interesting way of phrasing it. If he'd chosen to pay the tax assessed at the time of assessment, he wouldn't be faced with the multiples. Your honor, I'd respond by saying it wasn't his choice. The tax return that reported this liability was filed more than six months after Mr. Tricarichi sold his interest in the corporation and he had nothing to do with the company at the time. And he had nothing to do with the tax arrangements that produced the litigation now in front of us? He had nothing to do. There was a distressed debt transaction that the stock purchaser implemented in November of 2003. Mr. Tricarichi sold his stock in September. So there was a several week, if not several month,  and the transaction that generated the underpayment of tax. I don't think you answered my question. I asked whether he had anything to do with the transactions that are the subject of the litigation in front of us. He sold his stock. And that's all he did? Never talked to any of the lawyers about the tax shelter? I certainly, your honor, his advisors at PricewaterhouseCoopers and at Hamloger, the law firm, were aware that there was a hypothetical strategy that the stock purchaser had put on the table as one way that it might, under the contract, satisfy its obligation to satisfy the taxes. The purchaser contractually represented to Mr. Tricarichi that it would satisfy fully, and those are the words in the contract, the income tax liability of Westside Cellular. So yes, to answer your question, your honor, Mr. Tricarichi was aware, and his advisors more specifically were aware, that there was a hypothetical strategy put on the table as one way that the stock purchaser might satisfy that tax liability. It also could have simply paid the tax and recognized that it got into a bad deal. That happens to stock purchasers all the time. They buy stock, think they can satisfy a liability, and the liability turns out to be far higher or greater than they assumed it would be. But Fortran was a completely unrelated third party in this case. Mr. Tricarichi, there's no even allegation that he was somehow colluding with them. There are allegations of collusion between Rabobank, a global financial institution, and Fortran, but there's no allegation that Mr. Tricarichi in any way colluded with them. He sold his stock. That's all he did. So yes, to answer your question, he was aware that there was a strategy that was put on the table as a hypothetical by the stock purchaser. But I think that's something far different from the economic substance cases that this court has decided in the past, and the Frank Lyons case from 1977 out of the Supreme Court, where the taxpayer goes in, and in their mind, they intend to enter a new transaction to save their own taxes. And so if you apply that two-prong test that this court has articulated, there you've got the mindset of a taxpayer going in to save or in some way avoid or evade their own tax liability. That's not what these cases are about. This case is not Mr. Tricarichi's tax liability. Mr. Tricarichi paid $5 million in income tax on this stock sale. He paid $3 million in disputed federal excise tax in order to get the stock sale done. This is not the kind of individual with that sort of tax avoidance mindset animus going into the transaction. But if you add those two figures together, that's still a lot less than the IRS said he owed when he received the money from the settlement, correct? I would go back, Your Honor, and say that Mr. Tricarichi did not owe that tax. We have to distinguish between his personal tax liability, which was fully paid, never disputed, and certainly not refunded by the IRS. The tax liability at issue in this case is the liability of a C corporation. But his C corporation? He was the 100% owner of the C corporation. That is correct. That is correct. And yes, it was $8 million that he paid in taxes. It was a little more than $10 million back in 2004 when the tax return was filed by the new owners of Westside Cellular that they thought they could implement a strategy to avoid. Obviously, that didn't work, otherwise we wouldn't be here today. But it's not orders of magnitude different from the liability that Mr. Tricarichi personally took on through both the excise taxes and the income taxes that he paid. And in fact, he paid more in income taxes because he got a greater economic return from his stock sale. He paid more in income taxes than he would have had he followed what the government said he has to do, which is to liquidate the corporation, a point I'll come back to in terms of what his options were at the time. So I know our briefs raise a number of issues and these cases are complicated and that they involve both Ohio state law and federal law. But if I could just focus the court's attention on two points, one is the factual error that we raise in our briefs. And that is with respect to the tax court's characterization of the transaction and in particular the timing of the transaction. And I certainly don't mean to elevate the form of a transaction over its substance. Substance is of critical importance and the ultimate question for this court. But the starting point has to be the right form. And you can't look at this court's two-pronged test and think about the objective economics of it if you get the ordering right. And the way the tax court described the transaction, it said that the money that was used to purchase Mr. Tricarichi's stock came from Westside. Well, if that's the case, those are the facts, this case is over. You can't use a corporation's own cash to purchase its stock. But it's undisputed, and I think the record makes clear and the government doesn't contest, that timing-wise, the money came from Rabobank. And it may have been a very short-term timing, but in the context of a secured lending transaction, which this case involved, albeit not one that Mr. Tricarichi had anything to do with, but the secured lending element of it, that is of absolute critical importance. As this court knows, if you've got a secured lender that comes to the county courthouse with a recorded lien or security interest moments after somebody else does, that is of absolute critical importance. So to get that form's starting point right, I think, is very important here. If you don't get that right, then looking at the objective substance of it, which is one of the two prongs in this court's economic substance test, you have the complete wrong starting point. You're using the corporation's own stock and this is a completely different case. So I'd just like to highlight that and again tie it back to what this court said in the Sloan decision, that you've got the two-prong test, the objective factor, and if you don't get the facts right to start with and you say that the corporation's own cash was used to purchase the stock, then that whole inquiry, that first prong, the objective prong of the inquiry, gets off on the wrong foot and is necessarily flawed. So I'd flag that. The second point I'd like to make is with respect to the economic substance test, and again going back to this court's decision in Sloan, and how that test should be applied. Before talking about the legal issues there, I would like to point out a very important distinction between this case and the other decided cases, what the government called MIDCO cases. The very first- Did you want to save time for rebuttal? Yes, I have just about two minutes. If I can make just the one factual point and I'll come back to it. To distinguish this case from the so-called MIDCO cases, the very first sentence from Judge Ikuda in the Sloan case says that this case, i.e. Sloan, involves two sales. Michael Ciccacci's case does not involve two sales. It involves one stock sale. There were no appreciated assets in this case, and I think that's an important distinction because in all of those other MIDCO cases decided by the other circuit courts, a taxpayer is going along with appreciated assets in a corporation, and with the intent to avoid the tax on those appreciated assets at the corporate level, they switch it into a stock sale, basically at the 11th hour. That didn't happen in this case. There's no intent in avoiding the corporate tax on the assets on Mr. Ciccacci's part because there were no assets there to be sold. So Mr. Ciccacci's only intent was to sell his stock. His only intent was to make money, and of course there was a tax element of it. He was aware of some tax-saving strategy on the part of the buyer, but his intent was to make more than $20 million in non-tax economic gain on the sale of his stock. With that, I've got just about a minute, and I'll reserve that if I could. May it please the Court, my name's Clint Carpenter, and I represent the Commissioner of Internal Revenue. Transferee liability is always about someone else's taxes, so the fact that Mr. Ciccacci did pay his own personal liability, that's not relevant to the transferee liability issue. The entire purpose of this transaction was so that Mr. Ciccacci could obtain more of Westside's cash than he could have otherwise obtained if he had just liquidated the corporation. And the only way he was able to do that, or intended to be able to do that, was through the avoidance of Westside's tax liability. Now, if Westside had just transferred the money to him directly, for example, in a distribution without paying his taxes, he would have been liable as a transferee. I don't think there's any dispute about that. So the question then is whether there's any difference between what happened here, whether there's any substantive difference between what happened here and the liquidation. And there is no substantive difference under this court's test in Sloan. This transaction lacked economic substance because there was no purpose for it other than tax avoidance, and because it offered no economic benefits other than the tax benefits that it created or purported to create. So the other question then is whether he is also a transferee under state law. There's no dispute that the transaction was constructively fraudulent. The only dispute is whether under the Ohio Uniform Fraudulent Transfer Act, the transaction was, whether Mr. Jakarczy was a transferee under the Uniform Fraudulent Transfer Act. And he was. As the Seventh Circuit concluded in the Feldman case, as the Eleventh Circuit recently concluded in the Shockley case, talking about the Wisconsin UFTA, those courts said that there's no meaningful difference between the substance over form principles that Wisconsin applied under the Wisconsin UFTA. There's no difference between substance over form in that context and the federal substance over form that, for example, this court applied in Sloan. And the same is true under the Ohio UFTA. The Ohio UFTA incorporates the same federal substance over form principles. The Ohio courts have applied substance over form principles to determine who is a transferee for purposes of the Ohio UFTA. And so for the same reasons that Mr. Jakarczy is a transferee under the federal tax law, he's also a transferee under the Ohio UFTA. There's also an issue in this case of liability for pre-notice interest. But unless there's any questions about that, we'll rest on it. I assume you would prefer we follow the, I think it was the Loewe case on that question? Oh, on that question. Yes, it's the First Circuit case, which is Shissel v. Werfel. Which I think follows the tax court cases. That's correct, it follows the tax court cases. I mean, essentially the issue is, the issue is that state law imposes liability for the entire tax debt, Westside's entire tax debt, up to the amount of money that Mr. Jakarczy received from Westside through this transaction. And so if that amount of money was not sufficient to cover all of Westside's debt, then the government would have to look to state law interest. For example, like pre-judgment interest or something like that. But where the interest, which is part of the federal interest, which is part of the federal tax debt, whereas here the amount received was enough to cover all of that, then the state interest provisions just don't come into play. But we have a simpler version in this case. Excuse me? We have the simpler question in this case. That is our case, isn't it here? Yes, yes, that is the case here. So it's the same case as was in the Shissel case in First Circuit and in the tax court cases. This court has not previously had occasion to reach the merits of that issue before, but there was the Edelson case where the court acknowledged that standard. So you're saying if we need to publish in this case on this very exciting issue, that this would be the opportunity for our court to do it? Yes, yes, this would be that opportunity. Okay. So and I appreciate the court's interest on this very exciting issue. I wouldn't go as far to say interest, but sometimes we have an obligation. The court's patience. All right. Thank you. I have just under a minute, but just briefly, Your Honor, to respond to Mr. Carpenter's comment about every transferee case involving someone's taxes, someone else's taxes. That is certainly the case, but every economic substance case where the government wants to disregard or recast a transaction involves this taxpayer's intent. And under this court's cases in Sloan, in Casebeer, in the other cases this court has decided, there must be a showing that this taxpayer, Mr. Tkarchi, had the intent of avoiding income tax. And all of those cases, if you look, for example, at the Casebeer case, there the transaction was projected to generate a $10,000 loss absent taxes. If you completely ignore the taxes and follow the path the government says Mr. Tkarchi had to do, which is reserve for tax for continued tax liability, 10 to $12 million, Mr. Tkarchi still would have made an economic return of north of $20 million in this case. Contrast that with Casebeer, where any way you cut it, the taxpayer was gonna lose $10,000 if you took the taxes out. So here, I think it's just very different from every other case that's been decided under the economic substance doctrine in this court, where it can't be said that there was any intent to do anything other than save taxes. Here, there are more than 20 million reasons why Mr. Tkarchi wanted to sell his stock other than taxes, and that was to make an economic return, a long-term economic return on his investment in Westside. So with that, my time is up and I will submit the case. Thank you. Thank you. Thank you both very much. Case Tkarchi will be.
judges: Reinhardt, W. Fletcher, Owens